# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JAMES A. FELDMAN, individually  )
and derivatively on behalf of Precision  )
Biologics, Inc.,  )
              )
            Plaintiff,  )
              )
      v.  )      C.A. No. 2017-0487-AGB
              )
PATRICK SOON-SHIONG,  )
CHARLES KIM, CHRISTIAN ZAPF,  )
and NANTCELL, INC.,  )
              )
            Defendants,  )
              )
      and  )
              )
PRECISION BIOLOGICS, INC.,  )
              )
      Nominal Defendant.  )

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

WHEREAS[1]:

A.    Nominal defendant Precision Biologics, Inc. ("Precision" or the "Company") is a research-and-development stage company that develops drugs

---

[1] The facts recited herein are taken from the Amended Complaint filed on November 6, 2017 (Dkt. 28), and documents incorporated therein. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citation and internal quotations omitted) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

intended to extend survival and improve the quality of life of cancer patients, as well as diagnostic products intended to enable earlier detection of cancer.[2] Plaintiff James A. Feldman and his family have been investors in Precision and its predecessor since their respective formations in 2012 and 2005.[3]

B.     On October 2, 2015, Precision and defendant NantCell, Inc. ("NantCell") entered into a stock purchase agreement (the "Purchase Agreement") pursuant to which NantCell purchased 40,964,051 shares of Precision's Series A Preferred Stock, representing 60.24% of the Company, for $50 million (the "Transaction").[4]

C.     Defendant Patrick Soon-Shiong controls several affiliated companies, one of which is NantCell, and serves as NantCell's CEO.[5] Defendants Charles Kim and Christian Zapf are executives at NantCell affiliates.[6] Pursuant to a Voting Agreement entered into in connection with the Transaction, NantCell secured the right to appoint three of five directors and have permanent voting control of the Precision board of directors (the "Board") regardless of vacancies.[7] At all relevant

---

[2] Am. Compl. ¶ 3.

[3] Am. Compl. ¶¶ 26-27, 31, 36.

[4] Am. Compl. ¶ 42; Defs.' Opening Br. Ex. 1 § 1.1(b) (Dkt. 34).

[5] Am. Compl. ¶ 4.

[6] Am. Compl. ¶¶ 5, 49.

[7] Am. Compl. ¶¶ 46-47; Defs.' Opening Br. Ex. 2 §§ 1.1, 1.2(a).

2

times, the NantCell appointees have been Soon-Shiong, Kim, and Zapf (the "Individual Defendants").[8]

D.    Simultaneously with the execution of the Purchase and Voting Agreements, Precision and certain of its investors, including NantCell and Feldman, entered into an Investors' Rights Agreement (the "Rights Agreement").[9]  Among other things, the Rights Agreement directs how the proceeds from the NantCell investment are to be maintained and used, imposes certain governance obligations on the Board, and establishes information rights for the Company's "Major Investors," including plaintiff.[10]

E.    With respect to the management of the proceeds, Section 5.2 of the Rights Agreement requires that the $50 million paid by NantCell be deposited in a Company-owned account (the "Financing Account") to be "maintained by NantCell on behalf of the Company" and over which Soon-Shiong has sole signature authority.[11]  Section 5.2 further requires the Board to "direct the transfer of funds from the Financing Account to [an Operating Account] in amounts (i) sufficient to satisfy at all times at least three (3) months of budgeted expenses consistent with the

---

[8] Am. Compl. ¶ 48.

[9] Am. Compl. ¶ 53; Am. Compl. Ex. 1.

[10] Am. Compl. ¶¶ 53-61; Am. Compl. Ex. 1 §§ 3.1, 3.2, 5.2, 5.3.

[11] Am. Compl. ¶¶ 55-58; Am. Compl. Ex. 1 § 5.2.

3

Company's business plan and budget as the same shall be approved and/or modified by the Board, and (ii) necessary to satisfy other expenditures approved by the Board."[12]

F. Sometime in October 2015, within thirty days of the closing of the Transaction, Soon-Shiong withdrew from the Financing Account approximately $47 million, representing about 94% of the Transaction consideration.[13] Soon-Shiong took this action without notifying or consulting the Board.[14] Over the next two years, Soon-Shiong provided only sporadic *ad hoc* payments, totaling approximately $9 million to $10 million, to fund Precision's operations.[15] As a result, the Company allegedly lacked access to the three months of operating funds, as required under the Rights Agreement, and was months behind in paying its suppliers by mid-2016.[16]

G. On May 2, 2017, after the Company had not provided any of the information required under the Rights Agreement, fifteen "Major Investors" sent a written request for the required information.[17] On May 30, 2017, after Precision did

---

[12] Am. Compl. Ex. 1 § 5.2.

[13] Am. Compl. ¶ 72.

[14] Am. Compl. ¶ 73.

[15] Am. Compl. ¶¶ 63-65.

[16] Am. Compl. ¶¶ 63-71.

[17] Am. Compl. ¶ 16.

4

not respond to this request, plaintiff made a formal demand for information pursuant to 8 *Del. C.* § 220.[18]

H.    On June 15, 2017, the Board held its first meeting since before the Transaction and terminated all of Precision's administrative and accounting employees.[19]  The Board outsourced these functions to NantCell or other companies affiliated with Soon-Shiong in exchange for payments of hundreds of thousands of dollars per month.[20]  That same day, shares of stock of two public corporations with a market value of approximately $38.7 million were deposited in the nearly depleted Financing Account.[21]  On June 29, 2017, one of the two directors on the Board who had not been appointed by NantCell, Stan Archibald, resigned from the Board out of frustration and concern over how defendants were operating the Company.[22]

I.    On July 5, 2017, Feldman filed his initial complaint, which he amended on November 6, 2017.[23]  The Amended Complaint asserts six claims.[24]

---

[18] Am. Compl. ¶¶ 16-17.

[19] Am. Compl. ¶¶ 73, 82.

[20] Am. Compl. ¶¶ 82-83.

[21] Am. Compl. ¶ 107.

[22] Am. Compl. ¶ 51.

[23] Dkt. 1, 28.

[24] Am. Compl. ¶¶ 115-157.

5

J. On November 21, 2017, defendants moved to dismiss the Amended Complaint in its entirety under Court of Chancery Rules 12(b)(6) and 23.1.[25]

NOW THEREFORE, the court having considered the parties' submissions, IT IS HEREBY ORDERED, this 8th day of May, 2018, as follows:

1. The standards governing a motion to dismiss for failure to state a claim for relief are well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[26]

2. **Count I.** This claim asserts that NantCell and the Individual Defendants breached the Rights Agreement, including the implied covenant of good faith and fair dealing therein. Defendants' motion to dismiss Count I is **DENIED** in part and **GRANTED** in part because the Amended Complaint (1) alleges facts from which it is reasonably conceivable that NantCell breached the express terms of Section 5.2 of the Rights Agreement by failing to maintain the Financing Account in accordance with that provision,[27] but (2) does not allege facts sufficient to support

---

[25] Dkt. 31.

[26] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[27] Am. Compl. ¶¶ 74, 118(b); Am. Compl. Ex. 1 § 5.2.

6

a claim (i) for breach of the implied covenant of good faith and fair dealing, or (ii) against the Individual Defendants.

3.     The core issue in Count I concerns Section 5.2 of the Rights Agreement. That provision requires the Financing Account to be "established and maintained by NantCell on behalf of the Company."[28] The term "maintained" is not defined in the Rights Agreement. A reasonable interpretation of that term in the context of the agreement is that NantCell agreed to preserve the Transaction proceeds in the Financing Account and only would withdraw funds from the Financing Account to transfer them to the Operating Account in amounts necessary to satisfy certain specified obligations, *e.g.*, funds sufficient to satisfy three months of budgeted expenses.[29] NantCell did not operate the Financing Account in this manner. To the contrary, Soon-Shiong, NantCell's controller, withdrew $47 million of the $50 million in Transaction proceeds within thirty days of the Transaction. Accordingly, plaintiff has advanced a reasonable interpretation of Section 5.2 to state a claim for relief and preclude dismissal of that aspect of Count I as to NantCell.[30]

---

[28] Am. Compl. Ex. 1 § 5.2.

[29] *Id.*

[30] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (citations omitted) ("Because the provisions at issue in the Agreement are susceptible to more than one reasonable interpretation, for purposes of deciding a motion to dismiss, their meaning must be construed in the light most favorable to the non-moving party. A trial court must not dismiss any claim pursuant to Rule 12(b)(6) unless it appears with reasonable certainty

7

4.     NantCell cannot be liable for the other alleged breaches of the express terms of the Rights Agreement that Feldman asserts,[31] because the obligations arising from those provisions are owed by the Company or the Board, and *not* by NantCell.[32] For similar reasons, the Individual Defendants, who are not parties to the Rights Agreement, cannot be liable for breaching that contract,[33] including any implied covenant within the Rights Agreement.[34] Thus, Count I is dismissed as to the Individual Defendants.

5.     Feldman also has failed to state a claim for breach of the implied covenant of good faith and fair dealing against NantCell. "The covenant is best

---

that the plaintiff cannot prevail on any set of facts which might be proven to support the allegations in the complaint.").

[31] Am. Compl. ¶ 118(a), (c)-(h).

[32] Am. Compl. Ex. 1 §§ 3.1 (Company obligations to deliver certain information to each Major Investor), 5.2 (Board obligations to direct the transfer of funds from the Financing Account to the Operating Account), 5.3 (Company and/or Board obligations regarding various Board-related matters). *See VLIW*, 840 A.2d at 612 ("In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate," *inter alia*, "the breach of an obligation imposed by that contract").

Feldman argues that NantCell is responsible for the Company's and Board's purported breaches of the Rights Agreement because NantCell "controlled the Company through its equity voting control and control of the Board." Pl.'s Answering Br. 28-29. In effect, Feldman contends that NantCell should be liable for aiding and abetting a breach of contract. This argument fails where the claim asserted (Count I) is purely contractual in nature. *See Allen v. El Paso Pipeline GP Co. L.L.C.*, 113 A.3d 167, 194 (Del. Ch. 2014).

[33] *See Wood v. Wallace*, 752 A.2d 1175, 1180 (Del. Ch. 1999) ("It is a general principle of contract law that only a party to a contract may be sued for breach of that contract.").

[34] *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 2011 WL 4599654, at *11 (Del. Ch. Sept. 30, 2011) (citation omitted) ("The implied covenant . . . only potentially binds the parties to an agreement.").

8

understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[35] Here, it could have been anticipated when the parties entered into the Rights Agreement that NantCell would withdraw funds from the Financing Account, since Soon-Shiong was provided sole signature authority over the account.[36] Further, Feldman has not identified any "gap" in the Rights Agreement. Rather, his breach of contract claim is premised on NantCell's violation of an express term of the Rights Agreement, *i.e.*, the obligation to "maintain" funds in the Financing Account.

6. **Count II.** Pled in the alternative to Count I, Count II asserts that the Individual Defendants tortiously interfered with the Rights Agreement. Defendants' motion to dismiss Count II is **GRANTED** because Feldman has not alleged that the Individual Defendants were acting outside the scope of their authority as directors or officers of the Company (or of NantCell) when they purportedly tortiously interfered with the Rights Agreement. "It is . . . generally accepted that officers or directors may be held personally liable for tortious interference with a contract of

---

[35] *Nemec v. Shrader*, 991 A.2d 1120, 1131 (Del. 2010) (citation and internal quotations omitted).

[36] *See id.* at 1126 ("The implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider.").

9

the corporation if and only if they exceed the scope of their agency in so doing."[37] This pleading deficiency is fatal to Feldman's tortious interference claim.[38]

7.  **Count III.** This claim asserts that NantCell (as a controlling stockholder) and the Individual Defendants (as directors of the Company) breached their fiduciary duty of loyalty in two respects: (1) by failing to disclose information to plaintiff "regarding the Financing Account proceeds,"[39] and (2) by using "their control to enrich NantCell and Soon-Shiong at the Company's expense, most obviously by taking $47 million in cash from the Company."[40]

8.  The first aspect of Count III, which is a direct claim, fails to state a claim for relief because there is no general fiduciary duty to disclose information to

---

[37] *Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *8 (Del. Ch. June 14, 2002) (citation, internal quotation, and alterations omitted).

[38] Feldman argues that "Defendants caused Precision Biologics to breach the Rights Agreement not because it was in the Company's best interest, but because it was in the best interest of Soon-Shiong and NantCell to usurp the Company's property." Pl.'s Answering Br. 34. This argument does not support a tortious interference claim but forms the basis of a breach of fiduciary duty claim, as explained below with respect to Count III. *See Goldman*, 2002 WL 1358760, at *9 (citation omitted) ("I further note the absence of any allegation in the Complaint to justify an inference that the directors acted outside the scope of their authority. The Complaint raises questions as to whether the directors breached their fiduciary duty of loyalty. Merely because directors are alleged to have acted in part with adverse motives does not necessarily lead to the conclusion that they acted outside the scope of their authority for the purposes of holding directors personally liable in tort for interfering with the contractual rights of a shareholder.").

[39] Am. Compl. ¶ 130; Pl.'s Answering Br. 37 (Dkt. 39).

[40] Pl.'s Answering Br. 40.

10

stockholders.[41] That said, the Rights Agreement creates a *contractual* duty for the *Company*—not any of the defendants individually—to provide certain information to each "Major Investor."[42] The Amended Complaint, however, does not assert this contractual claim against the Company.

9.     Plaintiff acknowledges that the second aspect of Count III is derivative in nature. "Under Delaware law, depending on the factual scenario, there are two different tests for determining whether demand may be excused. . . . The test articulated in *Aronson v. Lewis* applies when 'a *decision* of the board of directors is being challenged in the derivative suit.' The test set forth in *Rales v. Blasband*, on the other hand, governs when 'the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit,' such as instances 'where directors are sued derivatively because they failed to do something.'"[43] Under either test, a plaintiff "must impugn the ability of at least half

---

[41] *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *3 (Del. Ch. Aug. 26, 2005) ("There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, a party must allege a fiduciary duty or a contractual duty to disclose."). Plaintiff has not alleged facts to support the existence of a fiduciary duty to disclose information concerning the proceeds taken from the Financing Account.

[42] Am. Compl. Ex. 1 § 3.1.

[43] *Feuer v. Redstone*, 2018 WL 1870074, at *8 (Del. Ch. April 19, 2018) (citations omitted and emphasis in original).

11

the directors in office when [he] initiated [his] action . . . to have considered a demand impartially."[44] Plaintiff has done so here.

10. When this action was filed, there were four directors on the Board: Soon-Shiong, Kim, Zapf, and non-defendant Phil Arlen.[45] Soon-Shiong is not disinterested with respect to the withdrawal of the $47 million from the Financing Account, because he personally benefited from the transaction and was the one with sole signature authority who removed the funds. Soon-Shiong also is self-interested with respect to the decision to outsource the Company's administrative and accounting functions to entities that he controls in exchange for hundreds of thousands of dollars per month. Furthermore, Kim and Zapf cannot impartially consider a demand with respect to these matters because they are both economically dependent on, and thus not independent from, Soon-Shiong.[46] Defendants appropriately concede that point.[47] Accordingly, a majority of the Board could not have impartially considered a demand with respect to these claims.

---

[44] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015) (citation omitted).

[45] Am. Compl. ¶¶ 5, 50-51. As noted previously, Archibald resigned from the Board shortly before this action was filed. *See* ¶ H, *supra.*

[46] *See* Am. Compl. ¶¶ 5, 49, 113 (alleging that Zapf and Kim are employees of Soon-Shiong-controlled companies, such that they "owe their livelihoods to Soon-Shiong and could not impartially consider a derivative demand").

[47] Tr. (Mar. 8, 2018) 36 (Dkt. 48).

12

11. The derivative aspect of Count III also states a claim for relief. The Individual Defendants as well as NantCell, as a controller, owe a fiduciary duty of loyalty to Precision's stockholders. "Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision."[48] Here, Feldman adequately has pled that defendants breached that obligation. The Amended Complaint alleges that NantCell and Soon-Shiong withdrew funds from the Financing Account to enrich themselves at the expense of the Company, a quintessential breach of the duty of loyalty claim.[49] Feldman also has stated a claim against all defendants with respect to the Board's decision to terminate the employment of all of Precision's administrative and accounting employees, transferring a majority of their functions in conflicted transactions with NantCell or other Soon-Shiong affiliated companies in exchange for hundreds of thousands of dollars per month.[50]

12. Count III fails, however, to allege facts sufficient to support a non-exculpated claim against Kim and Zapf, as Precision directors, for breach of fiduciary duty with respect to the withdrawal of $47 million from the Financing

---

[48] *US West, Inc. v. Time Warner Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996) (Allen, C.).

[49] *See generally Guth v. Loft*, 5 A.2d 503 (Del. 1939).

[50] Am. Compl. ¶¶ 82-83.

Account. The Company's certificate of incorporation contains an exculpation provision authorized by 8 *Del. C.* § 102(b)(7) such that neither Kim nor Zapf can be personally liable for money damages unless they acted disloyally or in bad faith.[51] The Amended Complaint does not allege that Kim and Zapf personally benefitted from the withdrawal of funds from the Financing Account and does not allege facts sufficient to demonstrate that these individuals were intentionally derelict in fulfilling their fiduciary obligations by failing to prevent the withdrawal of funds from an account over which Soon-Shiong had sole signature authority.[52]

13. Finally, the alleged fact that shares of stock worth approximately $38.7 million were placed in the Financing Account over a year and a half after Soon-Shiong withdrew $47 million from that account[53] does not moot Feldman's claims with respect to the initial withdrawal. Breaches occur at the time of the alleged

---

[51] Defs.' Opening Br. Ex. 4 Art. SEVENTH; *see In re Cornerstone Therapeutics Inc., Stockholder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015) (Strine, C.J.) ("When a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith.") (citation omitted).

[52] *See In re Cornerstone*, 115 A.3d at 1187 ("[W]hen the plaintiffs have pled no facts to support an inference that any of the independent directors breached their duty of loyalty, fidelity to the purpose of Section 102(b)(7) requires dismissal of the complaint against those directors.").

[53] Am. Compl. ¶ 107.

14

wrongdoing,[54] and a number of damages theories may allow the Company to recover for the deprivation of funds, even it was only temporary.[55] In sum, the motion to dismiss Count III is **GRANTED** in part and **DENIED** in part in the manner explained above.

14. **Count IV**. Feldman seeks in Count IV the appointment of a custodian for the Company "to protect and preserve its assets and interests."[56] Although the Amended Complaint invoked 8 *Del. C.* § 226 as one basis for this request,[57] plaintiff failed to address that statute in his brief and thus abandoned the issue.[58] Instead, plaintiff argues that, if any of his claims for breach of fiduciary duty, breach of contract, or fraudulent inducement survives, "any such claim potentially supports the appointment of a custodian under Delaware law" as an equitable remedy.[59]

15. Using its equitable powers, the court may appoint "a custodian or receiver upon a showing of fraud, gross mismanagement, positive misconduct by

---

[54] *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *5 (Del Ch. Sept. 27, 2013) (Strine, C.).

[55] *See, e.g.*, *Thorpe v. CERBO, Inc.*, 676 A.2d 436, 445 (Del. 1996) (permitting damages incidental to defendants' breach of their duty of loyalty); *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. Ch. 2007) (requiring disgorgement of ill-gotten gains).

[56] Am. Compl. ¶ 139.

[57] Am. Compl. ¶ 133.

[58] *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[59] Pl.'s Answering Br. 41.

15

corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss which cannot otherwise be prevented."[60] "The appointment of a custodian or receiver on the ground of mismanagement calls for a cautious exercise of discretion of the Court. Such form of relief is radical and should be granted grudgingly."[61] Although it is highly unlikely that the court would appoint a custodian in this action based on the present allegations, the court is chary about foreclosing potential forms of relief at this stage of the case and thus declines to do so.[62] Accordingly, the motion to dismiss Count IV is **GRANTED** insofar as that claim is based on 8 *Del. C.* § 226, and **DENIED** insofar as a custodian is sought as a potential equitable remedy.

16. **Count V.** This claim asserts that NantCell and Soon-Shiong fraudulently induced Precision, plaintiff, and other "Major Investors" into entering the Purchase Agreement, the Voting Agreement, and the Rights Agreement. According to plaintiff, "NantCell or Soon-Shiong made the following false statements: NantCell would pay $50 million for the Preferred Stock; the Company would own the $50 million, with Shoon-Shiong having only signature authority over

---

[60] *Zutrau v. Jansing*, 2013 WL 1092817, at *5 (Del. Ch. Mar. 18, 2013) (citation omitted).

[61] *Barry v. Full Mold Process, Inc.*, 1975 WL 1949, at *2 (Del. Ch. June 16, 1975) (citation omitted).

[62] *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 991 (Del. Ch. 2000).

16

the account; the Board would regularly determine the Company's cash needs and control the Financing Account; and Soon-Shiong and NantCell would utilize the Financing Account funds to continue the Company's product development."[63]

17. To state a claim for fraudulent inducement, a plaintiff must allege, *inter alia*, "a false representation of material fact."[64] The "representations" that Feldman points to, however, are merely contractual terms of the Purchase Agreement and the Rights Agreement.[65] A breach of contract claim "cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform."[66] "Couching an alleged failure to comply with the [Purchase Agreement or Rights Agreement] as a failure to disclose an intention to take certain actions arguably inconsistent with th[ose] agreement[s] is exactly the type of bootstrapping this Court will not entertain."[67] For this reason, plaintiff has failed to state a claim for fraudulent inducement.

---

[63] Pl.'s Answering Br. 43-44 (citing Am. Compl. ¶¶ 42-44, 56-58).

[64] *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *21 (Del. Ch. Apr. 21, 2015) (citation omitted).

[65] Pl.'s Answering Br. 43-44.

[66] *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *5 (Del. Ch. Dec. 21, 1998) (citation omitted).

[67] *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *8 (Del. Ch. Aug. 3, 2004).

18.    Feldman cannot salvage his fraud claim by invoking a promissory fraud theory. To state a claim from promissory fraud, a plaintiff "must plead specific facts that lead to a reasonable inference that the promissor had no intention of performing at the time the promise was made."[68] Feldman argues that the speed with which NantCell and Soon-Shiong withdrew funds from the Financing Account and the failure to fund the Company's activities evidences their intention never to comply with the Rights Agreement.[69] These assertions, however, are based on events occurring after the Rights Agreement was executed and are inconsistent with specific allegations in the Amended Complaint that NantCell and Soon-Shiong did fund the Company after the Transaction closed, albeit on an *ad hoc* and allegedly insufficient basis.[70] Fairly read, plaintiff's allegations demonstrate that the parties disagree about the meaning of the terms of the Rights Agreement but are insufficient to support a reasonable inference that NantCell and Soon-Shiong never intended to perform under that agreement at the time of contracting. For the reasons stated above, defendants' motion to dismiss Count V is **GRANTED.**

---

[68] *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) (citation and internal quotations omitted).

[69] Pl.'s Answering Br. 44.

[70] Am. Compl. ¶¶ 63-65.

19. **Count VI.** This claim asserts that NantCell and Soon-Shiong violated the Blue Sky Laws of Texas and California, where NantCell's representatives were located. Defendants' motion to dismiss Count VI is **GRANTED** because Feldman has not pled any material misrepresentation, as required to state a claim under the Blue Sky Laws of both California and Texas.[71] Feldman alleges that NantCell and Soon-Shiong falsely stated, both orally and in writing, that NantCell would exchange $50 million for 40,964,051 shares of Precision preferred stock.[72] The Amended Complaint, however, flows from the premise that this exchange occurred. Similar to Count V, Feldman's actual grievance is that NantCell and Soon-Shiong did not abide by the terms of the Rights Agreement and improperly withdrew funds from the Financing Account. These allegations form the basis of viable claims for breach of contract and breach of fiduciary duty, as discussed above, but do not state a claim for a violation of the Blue Sky Laws of California or Texas.

Chancellor

---

[71] CAL. CORP. CODE § 25401 (West 2018); TEX. REV. CIV. STAT. ANN. art. 581-33 (West 2017).

[72] Am. Compl. ¶ 152.

19