**OF THE**
**STATE OF DELAWARE**

BONNIE W. DAVID
MAGISTRATE IN CHANCERY

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Final Report:  December 27, 2023
Date Submitted:  December 19, 2023

Jamie L. Brown, Esquire
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Avenue, Suite 200
Wilmington, Delaware  19801

Gary W. Lipkin, Esquire
Patrick A. Lockwood, Esquire
Saul Ewing LLP
1201 N. Market Street, Suite 2300
Wilmington, Delaware  19801

RE:  *I Am Athlete, LLC v. IM EnMotive, LLC*,
C.A. No. 2023-0332-BWD

Dear Counsel:

This final report resolves defendants IM EnMotive, LLC ("EnMotive"), EnMotive Company, LLC, and Steven Ginsburg's (collectively, "Defendants") motions to dismiss plaintiff I AM Athlete, LLC's ("Plaintiff") Verified Amended Complaint (the "Complaint").

In this action, Plaintiff, a California entity, seeks money damages for alleged breaches of an asset purchase agreement through which EnMotive acquired substantially all of Plaintiff's assets.  Plaintiff alleges that under the asset purchase agreement, EnMotive was required, but failed, to make commercially reasonable efforts to maximize the performance of the acquired business and to pay post-closing installment and earn-out payments.  Plaintiff's sole basis for invoking equity

jurisdiction is a thinly pled veil-piercing theory.  Although Defendants have moved

to dismiss in favor of arbitration, I do not reach arbitrability and instead recommend

dismissal for lack of subject matter jurisdiction, with leave to transfer to the Superior

Court pursuant to 10 *Del. C.* § 1902.

## I.    BACKGROUND

The following facts are taken from the Complaint and the documents

incorporated by reference therein.[1]

### A.    The Parties

Plaintiff I Am Athlete, LLC ("Plaintiff") is a California limited liability

company with its principal place of business in Los Angeles, California.  Verified

Am. Compl. [hereinafter, "Compl."] ¶ 1, Dkt. 28.  Prior to October 2019, Plaintiff

owned the "imATHLETE" business, "which provided software for online

registration for athletic events and related products."  *Id.*

---

[1] *See Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]" (citation omitted)).  The First APA (defined below), which is incorporated by reference in the Complaint, is attached as Exhibit A to Defendant IM EnMotive, LLC's Opening Brief In Support Of Its Motion To Dismiss.  Dkt. 34.

Defendant EnMotive is a Delaware limited liability company with its principal place of business in Buffalo Grove, Illinois. *Id.* EnMotive provides products and services for athletic events such as marathons. *Id.* ¶ 2.

According to the Complaint, "[a]t relevant times," Defendant Steven Ginsburg was President and a Member of EnMotive and "managed the day-to-day operations of the entity." *Id.* The Complaint alleges on information and belief that EnMotive and Ginsburg "are alter egos, and that at relevant times, Ginsburg was EnMotive's sole managing member, controlled the company, had unfettered access to its funds and commingled the same, including via ostensible loans and distributions between EnMotive and Ginsburg." *Id.* ¶ 3. The Complaint further alleges on information and belief that "Ginsburg disregarded corporate formalities, including by failing to hold board meetings at any time, and maintained family member(s) on EnMotive's payroll, including Ginsburg's brother . . . ." *Id.* And, the Complaint alleges on information and belief that EnMotive "was improperly capitalized . . . via personal loans or payments (including undocumented loans) from Ginsburg ranging into the six figures" and "had a negative net income with few assets." *Id.*

Defendant EnMotive Company, LLC ("EnMotive Successor") is a Delaware limited liability company with its principal place of business in Pittsford, New York.

*Id.* ¶ 4. The Complaint alleges that EnMotive Successor, which is wholly owned by non-party Gannett Co. ("Gannett"),[2] "was formed for the improper purpose of shedding certain liabilities" that EnMotive owed to Plaintiff. *Id.*

### B. Plaintiff Sells Substantially All Of Its Assets To EnMotive In A First Asset Sale.

In October 2019, Plaintiff and EnMotive entered into an asset purchase agreement (the "First APA") through which EnMotive acquired substantially all of Plaintiff's assets, including the imATHLETE business (the "First Asset Sale"). Compl. ¶ 10; *see also* Def. IM EnMotive, LLC's Op. Br. In Supp. Of Its Mot. To Dismiss [hereinafter, "OB"], Ex. A, Dkt. 34.

Under the First APA, EnMotive agreed to pay Plaintiff a $770,000 "Closing Payment" due at closing; a "First Installment Payment" of $550,000 due on or before January 31, 2022; and a "Second Installment Payment" of $380,000 due on or before January 31, 2023. OB, Ex. A § 1.5(a). EnMotive also agreed to pay Plaintiff "Earn-out Payments" "not to exceed a total of one million dollars" under certain circumstances. *Id.* §§ 1.5(c), 1.6(a). The First Installment Payment, Second

---

[2] The Complaint alleges that by March 2022, Gannett "owned and controlled both EnMotive Successor and EnMotive . . . ." Compl. ¶ 19.

Installment Payment, and Earn-out Payments are subject to a "Clawback" if the imATHLETE business fails to meet certain revenue thresholds. *Id*. § 1.9(b).

The First APA includes procedures governing the calculation of Earn-out Payments and any Clawback amounts. For Earn-out Payments, the First APA requires that EnMotive present to Plaintiff an "Earn-out Notice" that includes EnMotive's proposed determination of the Earn-out Payment and a detailed calculation of revenue. *Id*. § 1.9(a). For Clawback amounts, the First APA requires that EnMotive present to Plaintiff a "Clawback Notice" indicating EnMotive's election to claw back any Clawback amount. *Id*. § 1.9(b). In either circumstance, Plaintiff may deliver an "Objection Notice" and dispute the proposed amounts. *Id*. § 1.9(c)(i). If, following a negotiation period, the parties do not agree on the amount of the Earn-out Payment or Clawback:

> the items in dispute (but no other matters) shall be submitted to an independent accounting firm of recognized regional or national standing (excluding [EnMotive]'s accounting firm) mutually agreed upon and jointly retained by [EnMotive] and [Plaintiff] (the 'Final Arbiter'). The Final Arbiter shall make a final and binding determination as to all matters in dispute relating to the calculation of the Earn-out Payment and/or Clawback.

*Id*. § 1.9(c)(ii).

### C.     EnMotive Allegedly Breaches The First APA.

The First APA requires EnMotive to make "commercially reasonable efforts to maximize the performance of the [imATHLETE] Business" from January 1, 2021 through December 31, 2023.  OB, Ex. A § 1.6(e).

According to the Complaint, "[r]ather than making commercially reasonable efforts to maximize the performance of the [imATHLETE] Business, EnMotive instead shuttered the Business," including by "ceasing all efforts to generate business for the imATHLETE platform and instead devoting all efforts and resources to generating business for the EnMotive platform."  Compl. ¶ 14.  The Complaint alleges that by doing so, EnMotive "denied Plaintiff the benefits of its bargain to receive post-closing consideration by making it a certainty that there would be insufficient revenue to avoid the Clawback Provisions." *Id*. ¶ 15.

In January 2022, Plaintiff sent EnMotive a letter requesting the First Installment Payment.  *Id*. ¶ 17.  On January 26, 2022, Ginsburg responded that EnMotive would not be paying the First Installment Payment, the Second Installment Payment, or any Earn-out Payments.  *Id*.

### D.     EnMotive Sells Substantially All Of Its Assets To EnMotive Successor In A Second Asset Sale.

In March 2022, EnMotive and EnMotive Successor entered into an asset purchase agreement (the "Second APA") through which EnMotive Successor

acquired substantially all of EnMotive's assets, including the imATHLETE business (the "Second Asset Sale"). Compl. ¶ 19. Under the Second APA, EnMotive Successor agreed to purchase EnMotive's assets and certain liabilities for $1.7 million, with $1 million to be held in escrow until the earlier of the resolution of Plaintiff's claims or the passage of one year without Plaintiff filing a claim. *Id.* ¶ 20. The Complaint alleges that "the amount ostensibly reserved in escrow to cover those claims is insufficient to cover EnMotive's liabilities," and that the Second APA "expressly purported to carve out from EnMotive Successor's purchase any liability that EnMotive incurred in connection with [the First APA]." *Id.*

The Complaint further alleges on information and belief that "EnMotive funneled the proceeds that it received from [the Second Asset Sale] to Ginsburg, therefore siphoning away from EnMotive the assets necessary to satisfy its obligations under [the First APA]." *Id.* ¶ 21.

### E.    Procedural History

On March 17, 2023, Plaintiff initiated this action through the filing of a Verified Complaint. Dkt 1. On July 17, 2023, Plaintiff filed the operative Complaint. Dkt. 28.

The Complaint asserts three counts. Count I alleges that EnMotive and Ginsburg breached the First APA "by (1) failing to make commercially reasonable

efforts to maximize the performance of the [imATHLETE] Business, instead diverting resources and revenues from the Business, and (2) refusing to pay Plaintiff the required post-closing amounts after shuttering the Business and selling all of EnMotive's assets, or in the alternative, by failing to provide timely notice under the Clawback Provisions." Compl. ¶ 28. Count II alleges that EnMotive and Ginsburg breached the implied covenant of good faith and fair dealing inherent in the First APA "(1) by shuttering the Business instead of making commercially reasonable efforts to maximize its performance, and (2) by entering [the Second APA], which transferred to Gannett and/or Ginsburg the assets that should have been used to satisfy EnMotive's liabilities to Plaintiff under [the First APA], including its post-closing payment obligations." *Id*. ¶ 32. Count III alleges that EnMotive Successor tortiously interfered with the First APA.

On July 28, 2023, Defendants moved to dismiss the Complaint pursuant to Court of Chancery Rules 12(b)(1) and 12(b)(6) (the "Motion to Dismiss"). Dkt. 31. On September 1, 2023, Defendants filed opening briefs in support of the Motion to Dismiss. *See* OB, Dkt. 34; Defs. Steven Ginsburg And EnMotive Company, LLC's Op. Br. In Supp. Of Their Mot. To Dismiss, Dkt. 35. On September 29, 2023, Plaintiff filed answering briefs in opposition to the Motion to Dismiss. Pl.'s Ans. Br. In Opp'n To Def. IM EnMotive, LLC's Mot. To Dismiss [hereinafter, "AB"],

Dkt. 38; Pl.'s Ans. Br. In Opp'n To Defs. Steven Ginsberg And EnMotive Company, LLC's Mot. To Dismiss, Dkt. 39. On October 23, 2023, Defendants filed reply briefs in support of the Motion to Dismiss. Defs. Ginsburg And EnMotive Company, LLC's Reply Br. In Supp. Of Mot. To Dismiss, Dkt. 43; Def. IM EnMotive, LLC's Reply Br. In Further Supp. Of Its Mot. To Dismiss [hereinafter, "RB"], Dkt. 44. With leave of Court, Plaintiff filed a sur-reply in opposition to the Motion to Dismiss on November 22, 2023. Pl.'s Sur-Reply In Opp'n To Def. IM EnMotive, LLC's Mot. To Dismiss [hereinafter, "SRB"], Dkt. 53.

I heard oral argument on the Motion to Dismiss on December 19, 2023.

## II. ANALYSIS

Defendants move to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(1) for lack of subject matter jurisdiction, on the grounds that the First APA requires the parties to arbitrate disputes relating to the calculation of Earn-out Payments and the Clawback of Installment Payments. Alternatively, Defendants move to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted. At oral argument, I raised,

*sua sponte*, whether the Court of Chancery has subject matter jurisdiction over this action irrespective of Defendants' position on arbitration.[3]

"The Court of Chancery is a court of limited jurisdiction." *Yu v. GSM Nation, LLC*, 2017 WL 2889515, at *2 (Del. Ch. July 7, 2017). Title 10, Section 342 of the Delaware Code states that "[t]he Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State." 10 *Del. C.* § 342. The Court "maintains subject matter jurisdiction 'only when (1) the complaint states a claim for relief that is equitable in character, (2) the complaint requests an equitable remedy when there is no adequate remedy at law or (3) Chancery is vested with jurisdiction by statute.'" *Smith v. Scott*, 2021 WL 1592463, at *14 (Del. Ch. Apr. 23, 2021) (citation omitted).

---

[3] When granting the parties' proposed briefing schedule, I instructed them to "address this Court's subject matter jurisdiction over the claims asserted in the complaint." Dkt. 12. They did not. I surmise that is because the parties agreed in the First APA "not to assert, by way of motion, as a defense or otherwise . . . that . . . the subject matter [of Plaintiff's claims] may not be enforced in or by" this Court. OB, Ex. A § 6.14(a). The Court nevertheless has an "independent obligation to consider whether it has subject matter jurisdiction," notwithstanding the parties' refusal to engage on the issue directly. *Naughty Monkey LLC v. Marinemax Ne. LLC*, 2010 WL 5545409, at *3 n.35 (Del. Ch. Dec. 23, 2010).

The Complaint does not seek an equitable remedy, and the Court lacks statutory jurisdiction over Plaintiff's claims.[4]  Instead, the Complaint asserts, as its sole jurisdictional basis, that Ginsburg is subject to personal liability for breach of contract or the implied covenant of good faith and fair dealing under an "alter ego," or "veil-piercing," theory.  A claim premised on veil piercing "is an equitable claim." *Yu*, 2017 WL 2889515, at *3; *see also Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008) ("Under Delaware law, 'piercing the corporate veil may be done only in the Court of Chancery, when the purpose of the action is to obtain a judgment against individual stockholders or officers.'" (citation omitted)).  But "Chancery jurisdiction is not conferred by the incantation of magic words[,]" and simply asking to pierce the corporate veil is not an "open sesame" to equity jurisdiction.  *Yu*, 2017 WL 2889515, at *3 (footnote omitted) (first quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987); then *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991)).  Rather, to support jurisdiction over this action, Plaintiff's veil-piercing theory must be sufficiently pled.

---

[4] This Court lacks jurisdiction over Plaintiff's claims under 8 *Del. C.* § 111 because Plaintiff is not a Delaware entity.

"Persuading a Delaware court to disregard the corporate entity is a difficult task." *Yu*, 2017 WL 2889515, at *3 (citation and internal quotation marks omitted). "[B]ecause Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence." *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010). "In order to state a cognizable claim to pierce the corporate veil of [a corporation], plaintiffs must allege facts that, if taken as true, demonstrate the Officers' and/or the Parents' complete domination and control of the [corporation]." *Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999). In determining whether veil piercing is appropriate, the Court may consider "'(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder.'" *MicroStrategy Inc.*, 2010 WL 5550455, at *11 (citation omitted). "While these factors are useful, any single one of them is not determinative." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706-07 (Del. Ch. 2021). The overarching issue is whether "the

corporate structure [has] cause[d] fraud or similar injustice"—in other words, whether the corporation is "a sham and exist[s] for no other purpose than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184.

The allegations in the Complaint are insufficient to support a cognizable veil-piercing theory. For one, the Complaint does not allege facts that could support an inference that EnMotive functioned as a façade for Ginsburg. To the contrary, the Complaint alleges that prior to entering the First APA, EnMotive "provid[ed] products and services for events such as marathons" and "serviced the same general customer base" as Plaintiff. Compl. ¶¶ 2, 9; *see also* AB at 3-4 (explaining that "[a]t the time of the asset purchase, EnMotive was in a different, yet related, business" and occupied a "complementary position within the racing industry"). In other words, the Complaint alleges that EnMotive was not a "sham," but, instead, ran a real business. *See Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, 2023 WL 5688392, at *4-6 (Del. Ch. Sept. 5, 2023) (concluding veil-piercing theory was "deficient" where the plaintiff's "own allegations" describing two companies' separate businesses "subvert[ed] the notion" that one company existed as an "alter ego" for another, and "belie[d] any inference that [the companies] functioned as a single economic entity"); *DG BF, LLC v. Ray*, 2021 WL 776742, at *27 (Del. Ch. Mar. 1, 2021) (rejecting veil-piercing theory where the complaint alleged that the

corporation ran an active business and therefore was not a "sham"); *Yu*, 2017 WL 2889515, at *4 (same).

The Complaint also alleges that EnMotive "had a negative net income with few assets" and "was capitalized via personal loans or payments (including undocumented loans) from Ginsburg ranging into the six figures," and that, "at relevant times, Ginsburg . . . had unfettered access to [EnMotive's] funds and commingled the same" and "disregarded corporate formalities, including by failing to hold board meetings at any time . . . ." Compl. ¶ 3. But these allegations, each premised on information and belief, are conclusory and unsupported by any pled facts. *See Verdantus Advisors, LLC v. Parker Infrastructure P'rs, LLC*, 2022 WL 611274, at *2-3 (Del. Ch. Mar. 2, 2022) (concluding rote allegations that a limited liability company "observed few if any corporate formalities," was "inadequately capitalized," "siphoned funds," and "lack[ed] assets" were "not the exceptionally rare stuff of veil-piercing"); *DG BF, LLC*, 2021 WL 776742, at *27 (rejecting conclusory allegations based on "information and belief" that a corporation was undercapitalized and being used as the individual defendants' "personal piggy bank"); *Yu*, 2017 WL 2889515, at *4 (concluding veil-piercing allegations were insufficient to support jurisdiction where the complaint "include[d] no *non-conclusory* allegations that [the company] was inadequately capitalized from

February 2013 when [the plaintiff] provided the first loan to January 2016 when [the company] first failed to service the loan" (emphasis added)).[5]

Finally, the Complaint alleges on information and belief that "EnMotive funneled the proceeds that it received from the Second Asset Sale to Ginsburg, therefore siphoning away from EnMotive the assets necessary to satisfy its obligations under [the First APA]." Compl. ¶ 20. The Complaint pleads no facts from which the Court could reasonably infer that funds were "funneled" to Ginsburg through the Second Asset Sale. Notably, neither the Complaint nor the parties' briefing attaches the Second APA, so the terms of that agreement are a mystery.[6] The facts alleged, however, undermine EnMotive's conclusory "funneling" theory. Namely, the Complaint alleges that Gannett—not Ginsburg—"owned and controlled both EnMotive Successor and EnMotive" at the time of the Second Asset Sale. *Id.* ¶ 19.[7] The Complaint contains no well-pled facts supporting Plaintiff's theory that

---

[5] *See also Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *23 (Del. Ch. Feb. 27, 2020) (refusing to accept as true an allegation made on information and belief where the allegation was unsupported by well-pled facts); *O'Gara v. Coleman*, 2020 WL 752070, at *6 (Del. Ch. Feb. 14, 2020) (same); *Griffin Corp. Servs., LLC v. Jacobs*, 2005 WL 2000775, at *6 (Del. Ch. Aug. 11, 2005) (same).

[6] The Complaint does, however, allege that EnMotive Successor has held $1 million in escrow for Plaintiff's claims, undermining Plaintiff's theory that proceeds were "funneled" to Ginsburg. Compl. ¶¶ 20-21.

[7] *See also* AB at 9 ("At the time of this transaction, Plaintiff believes the same parent (*i.e.*, Gannett) owned and/or controlled both EnMotive Successor and EnMotive, such that this

Gannett, a public company that Ginsburg is not alleged to control, "funneled" assets from one affiliate to another to benefit Ginsburg personally.[8]

Because Plaintiff's veil-piercing theory is insufficiently pled, it cannot be used to invoke this Court's jurisdiction.[9]   Accordingly, the Complaint should be dismissed, with leave to transfer to the Superior Court.  *See Specialty DX Hldgs., LLC v. Lab'y Corp. of Am. Hldgs.*, C.A. No. 2018-0833-SG (Del. Ch. May 20, 2019) (TRANSCRIPT) (dismissing action with leave to transfer to the Superior Court where the complaint alleged claims for breach of an asset purchase agreement concerning earnout calculations and defendants moved to dismiss under contractual dispute

---

was an insider transaction intended to benefit Gannett and/or its affiliates to the detriment of Plaintiff's rights."); *id*. at 29 ("EnMotive then entered [the Second APA] to transfer its assets to EnMotive Successor, which is owned by the same parent as EnMotive.").

[8] Even if well pled, the transfer of funds in the Second Asset Sale could not satisfy the "fraud or injustice" element of the veil-piercing analysis, which requires that fraud arise "'from an inequitable use of the corporate form itself as a sham, and not from the underlying claim.'"  *Cleveland-Cliffs*, 2023 WL 5688392, at *6 (citation omitted).  This Court has explained that "'[t]o hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping.'"  *Id*. (citation omitted).

[9] Plaintiff argues that if the Court finds its veil-piercing allegations insufficient to support subject matter jurisdiction, it should be permitted to take jurisdictional discovery.  SRB at 3-6.  Given the lack of any well-pled facts supporting Plaintiff's veil-piercing theory, jurisdictional discovery would amount to a fishing expedition and should, therefore, be denied.  *See Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 5092894, at *2 (Del. Ch. Oct. 10, 2019) (noting that "the decision to grant jurisdictional discovery is discretionary"); *cf. P'rs & Simons, Inc. v. Sandbox Acqs., LLC*, 2021 WL 3161651, at *9 (Del. Ch. July 26, 2021) (explaining, in the context of personal jurisdiction, that "[a] plaintiff cannot use jurisdictional discovery to simply 'fish for a possible basis for this court's jurisdiction'" (citation omitted)).

resolution procedures; concluding the Court of Chancery lacked subject matter jurisdiction where the complaint failed to assert an equitable claim or seek equitable relief); *B&C Hldgs., Inc. v. Temperatsure Hldgs., LLC*, C.A. No. 2018-0645-JTL, at 20 (Del. Ch. Feb. 8, 2019) (TRANSCRIPT) (dismissing action for lack of subject matter jurisdiction "subject to transfer to Superior Court"; observing that the Superior Court is "just as capable as [the Court of Chancery] of determining whether an arbitrating accountant . . . has the look and feel of an expert").

## III. CONCLUSION

For the reasons explained above, I recommend that the Court dismiss the Complaint for lack of subject matter jurisdiction, with leave to transfer to the Superior Court pursuant to 10 *Del. C.* § 1902. This is a final report pursuant to Court of Chancery Rule 144(d)(1).[10]

Sincerely,

*/s/ Bonnie W. David*

Bonnie W. David
Magistrate in Chancery

cc: All counsel of record (by File & ServeXpress)

---

[10] *See* Ct. Ch. R. 144(d)(1) ("In actions that are not summary in nature or in which the Court has not ordered expedited proceedings, any party taking exception shall file a notice of exceptions within eleven days of the date of the report.").